IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION

| | |
|---|---|
| EDWARD VOGEL,<br><br>Plaintiff,<br><br>vs.<br><br>NANCY A. BERRYHILL, Acting<br>Commissioner of Social Security,[1]<br><br>Defendant. | 3:16-cv-89-RGE-HCA<br><br><br><br><br>REPORT AND RECOMMENDATION<br>(FILED UNDER SEAL) |

Plaintiff Edward Vogel seeks review of the Social Security Commissioner's decision denying his application for disability benefits ("DIB") under Title II and supplemental security income ("SSI") under Title XVI of the Social Security Act (the Act), 42 U.S.C. §§ 401–434; 1381–1385. This Court reviews the Commissioner's final decision pursuant to 42 U.S.C. § 405(g); 1383(c)(3). The case is before the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). The Court considers the matter fully submitted on the briefs.

I.  PROCEDURAL AND FACTUAL BACKGROUND

On September 10, 2013, Vogel filed an application for disability benefits and for supplemental security income alleging an onset date of May 4, 2013. (Tr. at 189–95). The Social Security Administration ("SSA") initially denied Vogel's claim on November 11, 2013, (*id.* at 69–

---

[1] Nancy A. Berryhill, became the Acting Commissioner of Social Security on January 23, 2017. Pursuant to Federal Rule of Civil Procedure 25(d)(1), she is substituted for Carolyn Colvin as Defendant in this suit, which may continue without further action. *See* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

92) and again upon reconsideration on April 1, 2014. (*Id.* at 95–122)[2]. The SSA granted Vogel's hearing request. Administrative Law Judge ("ALJ") David W. Thompson held a hearing on June 18, 2015. (*Id.* at 36–66). Vogel appeared with attorney Thad Murphy and vocational expert Alfred Walker also appeared. On July 23, 2015, the ALJ issued an unfavorable decision, finding Vogel was not disabled. (*Id.* at 13–26). Vogel requested a review of the ALJ's decision. The Appeals Council denied the request for review and the ALJ's decision became a final decision on July 16, 2016. (*Id.* at 1–3). Vogel timely filed the Complaint [1] in this case on September 8, 2016.

A. **Educational and Vocational Factors**

Vogel was 39 years old when he filed for benefits. (Tr. at 189). Vogel previously worked as a slicer at a Kraft Oscar Mayer plant and as a host at a Cracker Barrel restaurant. (*Id.* at 46, 60). The ALJ deemed both of those past positions to be past relevant work. (*Id.* T 61). Vogel had obtained an associate's degree in psychology. (*Id.* at 45).

B. **Medical Evidence**

Vogel's medical issues began approximately May 5, 2013, when he visited the emergency room at Genesis Medical Center with a complaint of pain in his right shoulder. (Tr. at 320). Vogel reported to the ER for a follow-up visit on May 7, 2013. (*Id.* at 364). X-rays showed no fracture, dislocation or lytic or destructive bony process, nor significant degenerative changes. (*Id.* at 365). Vogel was referred to Orthopaedic & Rheumatology Associates ("ORA") for follow up and had his first visit with Dr. Suleman Hussain on May 22, 2013. (*Id.* at 381–82). ORA took X-rays of Vogel's cervical spine, which revealed degenerative changes in the upper third of the cervical spine. (*Id.* at 381). Vogel weighed 225 pounds at this time. Dr. Hussain observed positive Neer

---

[2] The initial Disability Determination Explanation dated November 15, 2013, and the reconsideration Disability Determination Explanation dated April 1, 2014, are both contained in the record twice and the Court has cited to the duplicate documents.

and Hawkins signs in the right shoulder, soreness in the neck along the paracervical region and numbness and tingling in certain neck positions. (*Id.*) Dr. Hussain's initial impression was a mix of cervical radiculopathy as well as shoulder impingement and rotator cuff tendonitis. (*Id.*) Dr. Hussain recommended treating the rotator cuff tendonitis with shoulder injections and a course of prescription strength Motrin for a month, along with some physical therapy. (*Id.* at 381–82).

Vogel visited with physical therapist Chris Murphy on May 30, 2013. (Tr. at 440–42). Physical therapy recommended rehabilitative therapy twice a week for six weeks with the goals of decreasing pain, improving motor control, and increasing range of motion and strength. (*Id.* at 442). Vogel canceled a June 3, 2013, appointment. (*Id.* at 445). On June 5, 2013, Vogel advised the physical therapist Dr. Hussain advised him to stop therapy until further notice and that he would be having an MRI of the neck and shoulder. (*Id.* at 446). The physical therapist's office attempted to contact Vogel later regarding further scheduling, but he did not return the phone calls. (*Id.* at 448). Vogel was discharged from physical therapy on June 24, 2013. (*Id.* at 448).

Vogel saw Dr. Hussain again on June 5, 2013. While the cervical injection brought significant relief, therapy did not help and the anti-inflammatories had helped with some of the discomfort. Vogel experienced persistent pain and discomfort. (Tr. at 380). On physical examination, his right shoulder showed weakness in Jobe's, positive Spurling sign and weakness in thumb abduction. (*Id.*) Vogel reported sensory deficiencies in the extremity on palpation. He had negative Neer and Hawkins signs and no point tenderness about the right shoulder. Vogel's left shoulder had full range of motion and no discomfort or weakness. (*Id.*) Dr. Hussain planned to get an MRI of Vogel's cervical spine to rule out cervical radiculopathy as well as an MRI of the shoulder to rule out rotator cuff deficiency. (*Id.*)

At a visit with Dr. Hussain on June 14, 2013, Vogel continued experiencing symptoms of numbness and tingling in the right extremity and showed some improvement with the injection course. (Tr. at 379). Dr. Hussain reviewed the MRI of both the cervical spine and shoulder and viewed a right paracentral disk protrusion at C6-C7, which Dr. Hussain believed accounted for most of Vogel's symptoms. Dr. Hussain scheduled Vogel for a cervical epidural with a follow-up plan to send to Dr. Luszczyk for other options if the epidural failed. (*Id.*)

Vogel visited Dr. Myles Luszczyk on July 8, 2013. (Tr. at 376–78). Vogel reported pain that radiated into his right shoulder and right upper extremity along with some residual weakness. He rated the pain at 7/10 and constant in nature, waking him from sleep. (*Id.* at 376). Exercise, twisting, and lifting exacerbated his symptoms, while rest and pain medications improved them. Vogel thought the epidural injection aggravated his symptoms more and made him nauseous. (*Id.*) At the time of examination, Vogel weighed 205 pounds and smoked a half a pack of cigarettes a day. Dr. Luszczyk noted weakness in the right upper extremity with 4/5 shoulder abduction strength, 4/5 internal, external rotation strength of the right shoulder, 4/5 elbow flexion, elbow extension strength and wrist extension strength. Vogel's grip strength was approximately 4/5 and finger abductors 5/5. (*Id.*) The left side had 5/5 strength in all major motor groups. Vogel had decreased range of motion of the lumbar spine and some paraspinal muscle tenderness. (*Id.* at 377). Dr. Luszczyk reviewed the MRI, which showed significant degenerative changes at the C3-C4 level, some right-sided predominance of disk herniation at the C6-C7 level, more mildly at the C5-C6 and C4-C5 levels, "essentially causing stenosis primarily on the right side of the ventral thecal sac and the exiting nerve roots." (*Id.*) Although Vogel was young, Dr. Luszczyk recommended a three-level anterior cervical discectomy and fusion ("ACDF") procedure, possibly a four-level ACDF. (*Id.*) Dr. Luszczyk told Vogel he could not guarantee the weakness would improve and

that it may be permanent, that the goal of surgery would be to try to relieve some of the arm symptoms. Dr. Luszczyk told Vogel he could continue to have neck pain. (*Id.*)

Vogel met with Dr. Luszczyk again on July 16, 2013, to discuss the surgical options further. (Tr. at 374–75). They had an extensive discussion regarding the success rates with the four-level ACDF and that there was a "high chance" Vogel would need further surgery later. (*Id.* at 374). They discussed the complete risks and benefits of the procedure and Vogel wanted to proceed with the surgery. (*Id.* at 375). Vogel had quit smoking in preparation for the surgery, which Dr. Luszczyk stressed was imperative. (*Id.*)

Dr. Luszczyk performed a four-level ACDF at C3-C4, C4-C5, C5-C6, and C6-C7 on July 26, 2013. (Tr. at 395–97). Vogel tolerated the procedure well and stated the right upper extremity pain he had experienced prior to surgery was relieved, although he still had weakness in the right arm. (*Id.* at 391). He tolerated physical therapy while hospitalized. (*Id.* at 384). Dr. Luszczyk noted that Vogel still showed 4/5 results at the shoulder adductors, elbow flexors, elbow extensors, wrist extensors and slightly with wrist flexors. (*Id.*) Dr. Luszczyk discharged Vogel on July 29, 2013, in stable condition with directions not to bend, twist or lift anything greater than 15 pounds, and to wear his hard collar when standing or seated. (*Id.*)

At a follow-up visit with Dr. Luszczyk on August 8, 2013, Vogel reported the arm pain had been alleviated and he had no numbness in his upper extremity. Vogel still reported weakness in the right upper extremity. Dr. Luszczyk told Vogel there was no guarantee the weakness would improve over time and might be permanent. Dr. Luszczyk instructed Vogel to continue to wear his collar for another month and wear a bone stimulator as directed. (Tr. at 373).

On September 12, 2013, at a recheck Vogel reported he was improving, but still had neck pain if he was up and doing things. (Tr. at 423). He did not have numbness or tingling and no pain

in his upper extremities. Vogel still experienced weakness in the right upper extremity, which Dr. Luszczyk again explained he could not guarantee would improve and that the surgery was designed to prevent continued progression of weakness. (*Id.*) Dr. Luszczyk recommended waiting three months before starting Vogel in therapy to help augment his fusion potential. Dr. Luszczyk scheduled Vogel for a recheck in six weeks. (*Id.*)

Vogel returned to see Dr. Luszczyk on October 24, 2013. (Tr. at 429). He reported continued weakness in his right upper extremity, and demonstrated 4-/5 strength in elbow flexors, elbow extensors, wrist extensors, and grip strength compared to the left and shoulder abduction strength of 4/5. Vogel described his neck pain as "very tolerable" and he noted stiffness in his neck. (*Id.*) Dr. Luszczyk did not expect Vogel to have "any significant improvement in his arm strength" and wanted him to start with therapy to help strengthen the muscles, starting with lifting up to 15 pounds. (*Id.*)

On October 29, 2013, Vogel met with physical therapist Chris Murphy to develop a treatment plan to progress his right upper extremity strength. (Tr. at 431–32). Mr. Murphy recommended Vogel attend rehabilitative therapy three times a week for six weeks in conjunction with a home exercise program. (*Id.*) Vogel tolerated the October 29 treatment activity without complaints of pain or difficulty. (*Id.* at 431). Vogel attended a therapy session on November 19, 2013, and tolerated the activity with minimal complaints of pain and difficulty. (*Id.* at 451). While he tolerated exercise without complaints of fatigue, Mr. Murphy noted Vogel showed moderate loss in eccentric control in nearly all exercises within six to eight reps. (*Id.*)

On December 17, 2013, Vogel reported to Dr. Luszczyk for a recheck of his cervical spine. At that time, Vogel indicated he was not getting significant relief of the weakness in his right arm and was noticing some increased pain in the shoulder, including weakness with external rotation

and abduction of the shoulder. (Tr. at 428). Dr. Luszczyk told Vogel he expected Vogel might develop some rotator cuff pathology because of the nerve injury he sustained and might be developing an impingement type scenario due to the weak rotator cuff in the right upper extremity. (*Id.*) Dr. Luszczyk advised Vogel to return in three months and to exercise to keep his arm and shoulder strong. (*Id.*)

In a December 19, 2013, discharge note from physical therapy, Mr. Murphy wrote that he saw Vogel for upper extremity strengthening with emphasis on scapular retraining/stabilization, but he had only seen Vogel two times as Vogel had difficulty coming to therapy. (Tr. at 430). They had developed a home program in which Vogel showed good form, but fatigued quickly. Vogel had not returned Mr. Murphy's phone calls to reschedule. (*Id.*) Mr. Murphy discharged Vogel from physical therapy for "non-compliance" to an independent home exercise program. (*Id.* at 456–57).

On March 18, 2014, Vogel saw Dr. Luszczyk for a recheck of his cervical spine. (Tr. at 464). Vogel reported continued weakness in the right upper extremity and some discomfort in his neck, which was tolerable. (*Id.*) X-ray views of the cervical spine showed good consolidation of the ACDF and no evidence of displacement or nonunion. (*Id.*) Dr. Luszczyk planned to see Vogel in a year to ensure the fusion had taken, but the fusion progress to-date was positive. (*Id.*)

On April 7, 2015, Vogel saw Dr. Nathan Meloy at the Genesis Pain and Spine Center with complaints of neck pain radiating to his mid back into the right bicep to forearm stopping at wrist. (Tr. at 469-471). Vogel weighed 272 pounds at the time. (*Id.* at 470). There was numbness and tingling in his whole arm, more so in the pinky/ring finger into the hand down the lateral forearm and weakness in the right hand. (*Id.* at 469) Vogel reported physical therapy after his surgery had been painful. (*Id.*) On physical examination Dr. Meloy noted muscle strength in the left extremity was 5/5 and strength in the right deltoid, biceps, triceps and wrist extensors at 4+. Dr. Meloy started

7

Vogel on a prescription of Gabapentin. They discussed an injection to the site, but Vogel wanted to wait as he had a bad experience with a previous injection. (*Id.* at 471).

Vogel reported to Dr. Luszczyk on April 21, 2015, for a recheck regarding his neck. (Tr. at 465). Vogel still suffered from neck pain and had some residual numbness, tingling, and weakness in the right upper extremity, which Dr. Luszczyk believed resulted from the neurologic injury sustained to the right upper extremity. On examination, Vogel's strength was about 3+ elbow flexors, elbow extensors, wrist extensors, shoulder abductors as well as grip strength with full strength in the left upper extremity. (*Id.*) X-rays of the cervical spine showed good evidence of fusion. (*Id.*) Dr. Luszczyk opined that Vogel's neurologic deficits would be permanent and he had a profound weakness in the right upper extremity. (*Id.*) Dr. Luszczyk also opined about Vogel's future employability based on his injury, which will be discussed in the context of the ALJ's opinion. (*Id.*)

Vogel returned to the Genesis Pain and Spine Center on May 8, 2015, for follow-up with Dr. Meloy about his chronic neck pain. Vogel reported the numbness/tingling in his right arm had improved over 90% with Gabapentin. (Tr. at 472). Because he was experiencing drowsiness and twitchiness with the Gabapentin, he had been switched to Gralise, with which he still had some drowsiness. He still had constant aching pain in his neck, rating his pain at 3/10. On physical examination Dr. Meloy noted "Muscle Strength 5/5 in UE and LE." (*Id.*) Dr. Meloy planned to continue Vogel on the prescription for Gralise and would decrease the dosage if Vogel continued to experience drowsiness. (*Id.*) Dr. Meloy advised Vogel to schedule a follow-up in one month. (*Id.* At 472). There are no records showing any additional follow-up occurred.

## C. Hearing Testimony

The ALJ held a hearing on June 18, 2015. Vogel appeared by video conference from Davenport, Iowa with counsel. (Tr. at 38). Vogel was 40 years old at the time of hearing, 5'9" and 270 pounds, which he said was a gain of about 40 pounds in the last year. (*Id.* at 41). Vogel was married and had four children, ages 10, 9, 7 and 4. His mother-in-law lived with his family. (*Id.* at 42–43). His family lived in a one-story house with a basement for storage and laundry. (*Id.* at 43). His wife drove him to the hearing. (*Id.* at 44). The only income for the family was his wife's work in the kitchen at a Marriott hotel; his mother-in-law had social security (*Id.* at 44–45). They also received food stamps. (*Id.* at 45). Vogel had not applied for worker's compensation benefits or unemployment benefits. He had insurance through Medicaid. (*Id.*)

Vogel had obtained an associate's degree in psychology. (Tr. at 45–46). He could read and write the English language. His last day of work was April 29 or 30, 2013 as a slicer at the Kraft Oscar Mayer plant. (*Id.* at 46). Vogel had held that job since March 2004. (*Id.*) His job ended when he started experiencing problems in his neck and shoulder. (*Id.*)

The ALJ discussed Vogel's medications with him. Vogel took Cyclobenzaprine and Hydrocodone, as well as Citalopram (which he had been taking for about five years), and Lisinopril for high blood pressure. (*Id.* at 48–49). He took the pain prescriptions on an as-needed emergency basis as they made him very tired. (*Id.* at 48–50). He had tried Gabapentin and Cymbalta, which only helped with the nerve pain in his arm and not with his neck pain. (*Id.* at 50–51).

They discussed Vogel's surgery and hospitalization. Vogel stated he tried physical therapy, but it was not helpful so the doctor told him to stop going. (Tr. at 51–52). Vogel estimated he lost 28-30 percent of range of motion in his neck and did not regain any usage he had lost in his right

arm. (*Id.* at 52). Vogel described activities such as brushing his teeth with his right hand as making his arm hurt. (*Id.* at 53).

Vogel had a driver's license, but drove only occasionally to his kids' school a few blocks away. (Tr. at 53–54). He could take care of most of his personal hygiene, but no longer kept clean-shaven with a smooth head. Vogel's wife helped him put on his socks to attend the hearing. (*Id.* at 54).

On examination by his attorney, Vogel estimated he had driven maybe one mile in the last year as he had trouble checking his blind spots because he could not turn his neck all the way. (Tr. at 55). The most chores he could do around the house was help the kids with their homework. (*Id.*) He had to lie down at least hourly for up to 40 minutes. (*Id.* at 56). Prior to the surgery, he had constant burning pain in his right arm; after the surgery, he only had pain when he used the arm. (*Id.* at 56–57).

In examining the vocational expert, Mr. Alfred Walker, the ALJ asked the VE to assume an individual the same age, education, and experience as the claimant, limited to light work, limited to frequent climbing of ramps and stairs; occasional climbing of ladders; no climbing of ropes and scaffolds; frequent stooping, kneeling, crouching, and crawling; occasional overhead reaching bilaterally; and frequent handling and fingering with the dominant upper extremity who needed to avoid concentrated exposure to vibrations, unprotected heights, and unprotected moving machinery. (Tr. at 61–62). The VE opined that the individual could no longer work as a slicer, but could still work as a host. (*Id.* at 62). The ALJ changed the foregoing hypothetical in one respect—the individual was limited to occasional handling and fingering with the dominant upper extremity. (*Id.*) In response, the VE indicated the individual could no longer work as a slicer and could still do the host work using the non-dominant arm for handling, which would be going beyond the

10

description in the DOT. (*Id.* at 62–63). With a final modification to the hypothetical restricting limiting the dominant upper extremity to no handling and fingering, but use of the dominant upper extremity to support the non-dominant upper extremity, the VE responded the individual could no longer do any of their past work and there would be no other jobs in the economy for that individual. (*Id.* at 63–64). In response to questions from Vogel's attorney, the VE testified that if the individual had to lie down periodically during the day for up to an hour employment would be precluded. (*Id.* at 65).

## II. FINDINGS OF THE COMMISSIONER

In order to qualify for benefits under the Act, Vogel must have been disabled. "Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The Commissioner uses the following five-step evaluation to determine whether a claimant is disabled within the meaning of the Act and therefore eligible for disability benefits: "whether the claimant is (1) currently employed and (2) severely impaired; (3) whether the impairment is or approximates a listed impairment; (4) whether the claimant can perform past relevant work; and if not, (5) whether the claimant can perform any other kind of work." *Byes v. Astrue*, 687 F.3d 913, 915 n.2 (8th Cir. 2012)(quoting *King v. Astrue*, 564 F.3d 978, 979 n.2 (8th Cir. 2009)). If at step (4) the ALJ makes a finding that a claimant is unable to perform his/her past relevant work, the burden shifts to the Commissioner to prove with medical evidence the claimant" has a residual functional capacity to do other kinds of work, and that other work exists in significant numbers that [claimant] can perform." *Nalley v. Apfel*, 100 F. Supp. 2d 947, 952–53 (S.D. Iowa 2000)(citing cases).

Following the requisite five-step evaluation, the ALJ issued the written decision at issue in this case on July 23, 2015, and made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2018.

2. The claimant has not engaged in substantial gainful activity (SGA) since May 4, 2013, the alleged onset date (20 C.F.R. 404.1571 *et seq.* and 416.971 *et seq.*).

3. The claimant has the following severe impairments: residual condition post cervical spine fusion and obesity (20 C.F.R. 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except he can never climb ropes and scaffolds, but can only occasionally climb ladders; he can frequently climb ramps and stairs, and can frequently stoop, kneel, crouch and crawl; he is further limited to only occasional overhead reaching, bilaterally, but can frequently engage in handling and fingering with the dominant upper extremity; and, finally must avoid concentrated exposure to vibrations, unprotected heights and unprotected moving machinery.

6. The claimant is capable of performing past relevant work as a host. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. 404.1565 and 416.965).

7. The claimant has not been under a disability, as defined in the Social Security Act, from May 4, 2013, through the date of this decision (20 C.F.R. 404.1520(f) and 416.920(f)).

(Tr. at 15–26).

## III. STANDARD OF REVIEW

This Court "will affirm the ALJ's findings if supported by substantial evidence on the record as a whole." *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011)(quoting *Medhaug v. Astrue*, 578 F.3d 805, 813 (8th Cir. 2009)); *see also Kamann v. Colvin*, 721 F.3d 945, 950 (8th Cir. 2013); *Young v. Astrue*, 702 F.3d 489, 491 (8th Cir. 2013); 42 U.S.C. § 405(g)("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").

> Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion. To determine whether substantial evidence supports the decision, we must consider evidence that both supports and detracts from the decision. If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently.

*Wildman v. Astrue*, 596 F.3d 959, 963–64 (8th Cir. 2010)(internal citations and quotation marks omitted); *see Phillips v. Colvin*, 721 F.3d 632, 625 (8th Cir. 2013); *Kamann*, 721 F.3d at 950; *Young*, 702 F.3d at 491. The Court should not overturn the ALJ's decision as long as the decision "falls within the available zone of choice." *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011); *Heino v. Astrue*, 578 F.3d 873, 879 (8th Cir. 2009)(quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)). "The ALJ's decision 'is not outside the zone of choice simply because [the Court] might have reached a different conclusion had [the Court] been the initial finder of fact.'" *Heino v. Astrue*, 578 F.3d at 879 (quoting *Bradley*, 528 F.3d at 1115); *see Buckner*, 646 F.3d at 556.

## IV. DISCUSSION

Plaintiff challenges two aspects of the ALJ's decision: (1) the ALJ failed to properly assess the opinion of Vogel's treating physician, and (2) the ALJ erred in properly assessing Vogel's

13

subjective complaints leading to an improper RFC. Defendant responds the ALJ properly evaluated Dr. Luszczyk's opinion and Vogel's subjective complaints.

   A.   Assessment of Treating Physician Opinion

"Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Steed v. Astrue*, 524 F.3d 872, 875 (8th Cir. 2008)(quoting *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007)).

> A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight. . . . A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.

*Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000)(citing *Ghant v. Bowen*, 930 F.2d 633, 639 (8th Cir. 1991) and *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998)). Generally, the opinion of a consulting physician who has examined the claimant only once or only reviewed records is not substantial evidence, nor is the testimony of a vocational expert based on that evidence. *Singh*, 222 F.3d at 452 (quoting *Kelley*, 133 F.3d at 589 and citing *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000)).

Vogel complains the ALJ dismissed Dr. Luszczyk's opinion in its entirety because Dr. Luszczyk expressed an opinion that Vogel was disabled. At a minimum, Vogel argues, the ALJ should have considered Dr. Luszczyk's opinions that Vogel "would have permanent weakness and would be limited in his ability to perform work related activities with his right arm . . . ." (Pl. Br. [10] at 8). In response, Defendant points to several instances in the medical records indicating Vogel did not have "significant strength deficiencies in the right upper extremities." (Def. Br. [15] at 6). All but one of the records cited by Defendant involve pre-operative and within three months

post-operative examinations. The one examination that provides medical information on Vogel's upper extremity strength at 5/5 is from Dr. Meloy approximately two years after Vogel's surgery. (Tr. at 472). Dr. Meloy, a pain management specialist, was evaluating Vogel's complaints of neck pain and numbness/tingling down his right arm. His notes on physical examination on May 8, 2015, indicate "Muscle Strength 5/5 in UE and LE." (*Id.*) Vogel's right arm numbness/tingling had improved after starting on Gralise. (*Id.*) As noted by the ALJ, Dr. Luszczyk did not state "any specific functional deficits caused by the impairment." (*Id*. at 22). *See Strongson v. Barnhart*, 361 F.3d 1066, 1071 (8th Cir. 2004)(while giving little probative value to treating physician's statement that claimant was vocationally impaired because the finding was not within the doctor's expertise nor consistent with other findings, the ALJ incorporated many of the moderate limitations to which the doctor indicated the claimant was subject in the RFC).

In coming to a conclusion on the RFC for Vogel, the ALJ did not completely ignore Dr. Luszczyk's findings. He incorporated as a relevant limitation "only occasional overhead reaching bilaterally, but can frequently engage in handling and fingering with the dominant[3] upper extremity." (Tr. at 18–19). The ALJ also relied on the reports of the state agency medical records evaluators in developing the RFC and limited Vogel to light work with other relevant limitations. The ALJ properly evaluated Dr. Luszczyk's opinion and included limitations in the RFC that were consistent with the record as a whole. Based on the record as a whole, substantial evidence supports the ALJ's evaluation of the medical evidence and the weight placed on Dr. Luszczyk's findings.

B. Assessment of Subjective Complaints and RFC

In assessing a claimant's credibility, the ALJ must consider: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.

---

[3] Vogel is right-handed. (Tr. at 42).

15

*Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009)(citing *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) and *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)).

The ALJ gave three reasons for not finding Vogel credible: (1) he was noncompliant with physical therapy, (2) his recorded weight was inconsistent with his reported limitations; and (3) his right arm was not as limited as alleged. (Pl. Br. [10] at 9).

As to the first finding, the first time Vogel was sent to physical therapy on May 30, 2013, preceded his surgery. (Tr. at 443). Rehabilitative therapy visits twice a week for six weeks was recommended. (*Id.*) Vogel was a "no-show" for a June 3, 2013, appointment because the family did not have a babysitter. (*Id.* at 445). On June 5, 2013, the physical therapist spoke with Vogel, who indicated Dr. Hussain said he should stop therapy until further notice as he was going to have an MRI for his neck and shoulder. (*Id.* at 446). The physical therapy notes from June 24, 2013, indicate Vogel was contacted regarding further scheduling, but he did not return the phone call. He was discharged from therapy for noncompliance on that date. (*Id.* at 448). He was sent back to physical therapy on October 29, 2013, after his July surgery. (*Id.* at 449). The therapist recommended six weeks of skilled physical therapy together with a home exercise program. Vogel exhibited his understanding of the therapeutic activity and "tolerated the treatment/therapeutic activity without complaint of pain or difficulty." (*Id.* at 450). At a therapy visit on November 19, 2013, Vogel complained of continued right arm weakness with minimal pain and poor endurance while brushing his teeth and hair. (*Id.* at 454). He reported improvement in his neck symptoms and motion working on DNF exercise. (*Id.*) Vogel completed the treatment/therapy activity that day "with minimal complaints of pain and difficulty" and "tolerate[d] exercise without complaints of fatigue, but show[ed] moderate loss in eccentric control in nearly all exercises. . . within 6-8 reps." (*Id.* at 455). The therapist discussed continuing with strengthening as tolerated with emphasis on

control and quality. (*Id.*) On December 19, 2013, Vogel was discharged from physical therapy "secondary to: Client non-compliance; Attendance" as he had not rescheduled further appointments since the November visit. (*Id.* at 456). Based on the foregoing, the record supports the ALJ's finding that Vogel was noncompliant with treatment, which he must follow if the treatment would restore the ability to work, 20 C.F.R. § 416.930(a), reflecting on the credibility of his subjective complaints of impaired functioning.

With respect to the ALJ's finding concerning Vogel's inconsistent reported weight, the ALJ found the fluctuating weight inconsistencies reflected on Vogel's representation that he had gained weight due to lack of ability to exercise, "even though he has nothing wrong with his lower back or legs and is not prevented from walking." (Tr. at 23). The ALJ did not make an assumption tying weight loss to increased activity or lack of pain, only noted the contradiction between Vogel's report to the pain clinic that physical therapy after surgery was painful, (Tr. at 469), with the physical therapist's report he tolerated physical therapy with minimal complaints of pain. (*Id.* at 450, 455).

Finally, Vogel criticizes the ALJ's review of inconsistencies in measured strength by different medical sources, arguing the ALJ "compar[ed] raw medical data and interpret[ed] this data himself. This is not allowed." (Pl. Br. [10] at 11). The ALJ noted Dr. Luszczyk's findings on April 21, 2015, nearly two years after surgery, that Vogel had residual weakness in the right upper extremity with strength about 3+ elbow flexors, elbow extensors, wrist extensors, shoulder abductors, as well as grip strength with full strength in the left upper extremity. (Tr. at 22, citing to Ex. 9, p. 1 (Tr. at 465)). He then compared those findings to a report from Genesis Pain Management Center two weeks earlier on April 7, 2015, where Dr. Meloy noted muscle strength at 4+/5 in the right upper extremity and 5/5 on the left. (Tr. at 22, citing to Ex. 10, p. 1, 3 (Tr. at

17

471)). Finally, the ALJ noted at a May 8, 2015 exam at Genesis Dr. Meloy found muscle strength at 5/5 in all upper extremities. (Tr. at 22, citing to Ex. 10, p. 4 (Tr. at 472)). The ALJ also noted that three months after surgery Vogel was released to lift up to 25 pounds. (Tr. at 23, citing Tr. at 429). The ALJ recognized that Vogel had reduced strength in his right upper extremity but based on these findings that it was not a "useless arm" as alleged in Vogel's application materials. (Tr. at 23). These records support the ALJ's finding of inconsistences regarding the medical nature of Vogel's subjective complaints, which the ALJ is required to examine in determining an RFC, examining all the "medical records, observations of treating physicians and others, and claimant's own descriptions of his limitations." *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001).

Substantial evidence in the record as a whole supports the ALJ's credibility findings and the RFC determination; therefore, the Court should affirm the ALJ's decision.

## V.  REPORT AND RECOMMENDATION AND ORDER

After a thorough review of the entire record in accordance with the deferential standard of review, the Court concludes that the ALJ's determination that Vogel was not disabled within the meaning of the Act is supported by substantial evidence in the record when viewed as a whole. The undersigned recommends that the decision of the ALJ should be affirmed. The undersigned also recommends entry of judgment in favor of the defendant and against the plaintiff dismissing the Complaint.

IT IS ORDERED that the parties have until **August 22, 2017** to file written objections to the Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1). *Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990); *Wade for Robinson v. Callahan*, 976 F. Supp. 1269, 1276 (E.D. Mo. 1997). Any objections filed must identify the specific portions of the Report and Recommendation and relevant portions of the record to which the objections are made and must set forth the basis

for such objections. *See* Fed. R. Civ. P. 72; *Thompson*, 897 F.2d at 357. Failure to timely file objections may constitute a waiver of plaintiff's right to appeal questions of fact. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Griffini v. Mitchell*, 31 F.3d 690, 692 (8th Cir. 1994); *Halpin v. Shalala*, 999 F.2d 342, 345 & n.1, 346 (8th Cir. 1993); *Thompson*, 897 F.2d at 357.

**IT IS SO ORDERED.**

Dated the 8th day of August, 2017.

Helen C. Adams
Chief U.S. Magistrate Judge